MINNESOTA MINING & MANUFAC-
TURING COMPANY, Appellant,

v.

NISHIKA LTD., Lentec Corporation,
American 3D Ltd., and Nishika Manu-
facturing (H.K.) Ltd., Appellees.

No. 09–93–126 CV.

Court of Appeals of Texas,
Beaumont.

Submitted May 10, 1994.

Decided Oct. 13, 1994.

Margaret C. Ling, Vinson & Elkins, Houston, Carl A. Parker, Port Arthur, Russell J. Weintraub, Austin, Tom Alexander, Alexander & McEvily, Houston, Gilbert I. Low, Orgain, Bell & Tucker, Beaumont, Harry M. Reasoner, Vinson & Elkins, Houston, for appellant.

James B. Sales, Fulbright & Jaworski, Stephen D. Susman, Susman Godfrey, Houston, Walter Umphrey, Provost & Umphrey, Beaumont, for appellees.

Before WALKER, C.J., and BROOKSHIRE and BURGESS, JJ.

## OPINION ON MOTION FOR REHEARING

BROOKSHIRE, Justice.

On Motion for Rehearing the Court withdraws its opinion filed June 30, 1994, and its concurring and dissenting opinion filed August 4, 1994, and this opinion is substituted therefor.

Appeal from a jury verdict adverse to Minnesota Mining & Manufacturing Company ("3M"). The jury found that 3M had breached expressed warranties and implied warranties. The litigation arose pursuant to 3M's sale of certain materials, emulsion, and backcoat sauce used to make and produce three-dimensional photographs and photographic prints.

### Skeletal Background Facts and Contentions

The appellees, plaintiffs below, alleged that 3M's materials and products were incompatible and unsuitable with a new type of photographic emulsion that 3M had sold to LenTec Corporation in December of 1989. Appellees contended that the new emulsion was not fit and not suitable to use with 3M's other products. The incompatibility of the new emulsion was related to a certain backcoat sauce that 3M had sold to Nishika Ltd. ("Nishika") and LenTec. Nishika and LenTec bought mainly two products from 3M, being a light sensitive photographic emulsion and backcoat sauce. The backcoat sauce was developed by 3M to use with the emulsion.

The alleged destructive incompatibility caused the prints that Nishika had made with 3M's materials to fade badly and quickly. The claim in the district court was that the faded prints and photos caused the distributors, selling the three-dimensional cameras marketed by American 3D Corporation ("American 3D"), to lose confidence. This

loss .of confidence destroyed the plaintiffs' multi-level direct-sale-camera-distribution business. This loss caused harm and damages to four companies, decimating their business enterprises.

After a lengthy juried proceeding lasting about eight weeks, the jury found consistently in favor of the plaintiffs below on the warranty theories. The trial judge rendered judgment against 3M for $29,873,599 including pre-judgment interest and other relief. The plaintiffs below sought to recover damages including lost profits. The entities claiming lost profits were American 3D, Quantronics Manufacturing (H.K.) Ltd. ("Quantronics"), the manufacturer of the three-dimensional cameras, and its assignee, Nishika Manufacturing (H.K.) Ltd. ("Nishika H.K."), LenTec Corporation and Nishika Ltd. resulting from lost business and lost and reduced camera sales. Quantronics assigned its rights and actions to Nishika (H.K.).

The jury found that 3M had breached expressed warranties and implied warranties, both of which warranties concerned the suitability, fitness, and compatibility of the new emulsion that 3M had sold.

The plaintiffs below have been referred to collectively by the parties as the Nishika Plaintiffs. These four plaintiffs (the named appellees) were a group of companies linked by common ownership. In about the mid-1980s, one James Bainbridge had successfully owned and conducted a variety of businesses since about 1978. Bainbridge became interested and, indeed, fascinated with three-dimensional photography. His deep interest was triggered by an article that he had read in a magazine known as "Business Week". The article in "Business Week" was written about Nimslo Corporation. Nimslo, at that time, was the manufacturer of three-dimensional cameras. Later, Bainbridge and his partner, one Daniel Fingarette, established a company and by 1986 they had entered into a licensing agreement with Nimslo to allow and permit their own company to market 3–D cameras and also to market 3–D photo finishing. After the passage of time Bainbridge and Fingarette through their company acquired the world-wide patent rights to the 3–D photographic system from Nimslo.

The Bainbridge .enterprise and business expanded. Various closely aligned companies came into existence. They assumed different but interrelated roles in the manufacturing, marketing, and sales of the 3–D photography system. These closely aligned companies were based on common ownership between and by Bainbridge and Fingarette. Jointly these companies had a common purpose in fostering the development and marketing of the 3–D photographic system. Quantronics, and later its successor-assignee, Nishika (H.K.) actually made, manufactured, and produced the cameras that were capable of taking and did take 3–D photographs. Later in about the fall of 1988, American 3D was established to promote the sales of these special cameras to the public through a multi-level marketing system that included direct sales through certain, numerous individual distributors. This distribution system was described as being similar to the system used by Avon and the Fuller Brush Company. LenTec designed and engineered the printers and it produced a certain plastic lenticular material that was used in the 3–D photographs. Nishika printed out the 3–D photographs.

The record reflects that between 1986 and 1989 this family of four companies collectively made capital investments of approximately $40,000,000 in the 3–D business. Also the four companies working together substantially improved the older Nimslo 3–D photographic system through the expenditure of millions of dollars for advanced research in order to make the system more attractive and also more user-friendly. Likewise, the family of companies through research and investment developed to a higher degree the printers that were faster and produced better pictures and photographs. The companies expanded to a total personnel force in excess of 250 employees. Forty full-time engineers were hired. Many technicians were employed to improve and to maintain the high quality of the 3–D photographic system. By the end of 1989, the family of four companies had implemented a highly successful marketing strategy and had on board sixty thousand distributors. At this point in time, the 3–D camera sales and the

business attendant thereto were booming. American 3D had sold about 130,000 cameras, including 14,566 cameras sold within the month of December of 1989 alone.

The record clearly shows that 3M's products were absolutely crucial to the ongoing of the 3–D business. Actually 3M had originally supplied photographic emulsions to Nimslo. In the very early part of 1988, pursuant to and subsequent to his companies' acquisition of certain world-wide rights from Nimslo, Bainbridge and others met with Mr. Roger Lorenzini, a 3M vice-president. This group also met with other important 3M officials. At this meeting, Bainbridge told and informed the 3M officials in an unequivocal manner that the Nishika Plaintiffs were investing millions of dollars and were also in the process of and committed to investing tens of millions of dollars more to bring their 3–D cameras and 3–D photographs to market. Bainbridge gave a full explanation to the 3M officials as to how the entire program would be planned, executed, and rolled out. Bainbridge explained about Nishika's functions.

Then in 1988 and also 1989, Lorenzini engaged in several discussions with Tom Steimer. Tom Steimer was a vice-president with LenTec. Lorenzini then had detailed, personal knowledge of the plans of the four companies and their officials to use and to build a multi-level marketing system to sell the unique, attractive 3–D cameras. Lorenzini was very enthusiastic upon hearing about the companies' plans; he had been tracking 3M's sales to Nishika. He was delighted to project sales of between 1.2 to 1.3 million dollars. 3M received more than one million dollars from sales to Nishika and LenTec.

LenTec and Nishika had purchased two critical materials or products from 3M: a light-sensitive photographic emulsion, and also a backcoat sauce developed by 3M for use with the emulsion. The backcoat sauce and the emulsion supplied and sold by 3M were always intended by 3M to work together and 3M fully understood that it was essential that these print materials be suitable for the proper processing of 3–D photographs. Bainbridge had carefully and specifically told and advised 3M and its officials that if he did not have proper print materials, then he would not have a 3–D business.

In mid–1989, 3M announced an alleged and claimed breakthrough to the Nishika Plaintiffs. 3M had, it professed, developed a "new", "improved" emulsion that would work very well in the Nishika Plaintiffs' system. The four companies were joined in a common purpose, being the development, improvement, manufacturing, marketing, retailing, and sale of the entire 3–D photographic system. But 3M did not share or communicate and has never shared or communicated with the Nishika Plaintiffs the chemical composition of the "new", "improved" emulsion or the chemical make-up of 3M's products. Even so, 3M sold the "new" product to certain Nishika Plaintiffs. 3M expressly characterized the new product as a "new", "improved" emulsion. But 3M failed to inform Nishika and LenTec that the "new" and "improved" emulsion was experimental. Also 3M did not inform Nishika and LenTec that the "new" and "improved" emulsion had not been tested for compatibility with 3M's own backcoat sauce.

But as the record reflects 3M's "new", "improved" emulsion, which was supposed to work well and efficiently with 3M's backcoat sauce, was actually indisputably incompatible with its backcoat sauce and thus caused the photographs to fade within a very short time of their delivery. At the very time these crucial problems arose, Lorenzini admitted, according to the plaintiffs' evidence, that the fading problem was 3M's problem and Lorenzini said that 3M would stand behind its products and solve the problem.

The fading of the photographs took place at an extremely crucial time and at a disastrous time for the Nishika Plaintiffs. The fading photographs were caused by the incompatibility of the emulsion and the backcoat sauce. These crucial times occurred in December of 1989 when sales had been booming. For example, about 15,000 cameras had been sold on a monthly basis and the number of distributors for these 3–D cameras had risen to 60,000, being an all-time high. The problem of fading was exasperating and enhanced because the Nishika Plaintiffs simply did not know what was caus-

ing the fading of the photographs. Thus, they reprinted the faded pictures and then sent them back to the customers. But because of the fact that the pictures were being printed with the same "new", "improved" emulsion and backcoat sauce, the reprinted photos also faded.

The record contains evidence that experts, former distributors, and others testified that the faded photographs destroyed the credibility and business of the Nishika Plaintiffs' front-line distributors and caused the collapse of the entire multi-marketing system. Sales plummeted disastrously by about 600 percent during January of 1990. An example was that in December of 1989, 14,566 3-D cameras were sold. In the month immediately following, the sale of the cameras dropped to the number of about 2,000. This disastrous period occurred right after the introduction of 3M's defective print materials, the emulsion and the backcoat sauce. There is evidence of probative value that in the companies' history until January, 1990, the sales had never dipped more than 10 percent from any prior month. Despite vigorous efforts to save the business, the Nishika Plaintiffs' 3-D photographic business was totally destroyed. *Admittedly the above narration is the version of the evidence advocated by the Nishika Plaintiffs. But this evidence was before the jury and the jury acted as the fact finders in the litigation. The jury was empowered to decide where the preponderance of the evidence lay.*

A witness who qualified as an expert was a certified public accountant. The witness, Herb Warner, was a partner in an accounting firm known as Peat, Marwick. This certified public accountant testified that the Nishika Plaintiffs could have reaped soundly expected profits in the reasonable amount in excess of $97,000,000 by the end of 1994 but for 3M's breaches of warranties. This expert based his expert opinion, inter alia, upon and after examination of the Nishika Plaintiffs' financial statements and financial data, the actual records of the sales of the 3-D cameras that had occurred, as well as the upper trend in the volume of sales of the cameras and the expenses attributable to those sales.

Warner's opinions and evaluations were reinforced by one William Randall. Randall had earned a MBA degree with special expertise in multi-level marketing. Randall concluded that American 3D would have continued as a successful multi-level marketing company but for the faded photographs. These 3-D cameras were unique and their manufacturer gave meaningful support and help to the distributors. Randall, a highly qualified expert, projected sales of cameras for the years of 1990–1994. Randall gave expert evidence about the projected sales of the 3-D cameras. His projections were consistent with Warner's. Bainbridge, although an interested witness, corroborated Warner and Randall. He gave testimony as to what the businesses would have earned but for the fading of the photos.

It is Hornbook law in Texas that the jury is the exclusive judge of the facts proven, the credibility of the witnesses, and the weight to be given their testimony. The Texas jury has special prerogatives and exceptional powers in evaluating and weighing the testimony of experts and the jury can believe and find that a preponderance of the evidence lies in the testimony of interested witnesses and experts. The Texas jury is so empowered by the State Constitution and a legion of Supreme Court precedents.

It was a long trial. After hearing all of the evidence as well as the argument of counsel, the jury, in summary, found that: A) 3M had breached its express warranty that the new emulsion would be better than the old emulsion for the making of 3-D photographs; B) that 3M breached its implied warranty of merchantability; C) 3M breached its implied warranty of fitness for a particular purpose or use; D) 3M's various breaches of warranty were a "direct cause of the harm" suffered by Nishika, American 3D, Nishika Manufacturing (H.K.) Ltd. and LenTec; E) Nishika and LenTec failed to exercise reasonable care in evaluating and using the new emulsion; F) that Nishika's and LenTec's failure was also a direct cause of harm suffered by the Nishika Plaintiffs; G) that 3D was 51 percent at fault and that Nishika and LenTec were 49 percent at fault; H) and that Nishika Plaintiffs' damages were $50,000,000.

### Parts of the Charge to the Jury

The judge charged the jury: "You are the sole judges of the credibility of the witnesses and the weight to be given their testimony...." The judge also set out certain definitions for "Preponderance of the Evidence" and "Direct Cause":

1. By the term "preponderance of the evidence" as used in this Charge, is meant the greater weight and degree of credible evidence before you.

2. By the term "direct cause" as used in this Charge, is meant a cause which had a substantial part in bringing about the harm, either immediately or through happenings which follow one after another, incurred by any person or entity who may reasonably be expected to use, consume or be affected by the 3M photographic materials. There may be more than one direct cause of harm. When the effects of fault of each of two or more persons actively work at substantially the same time to cause the harm, each may be a direct cause of the harm.

3. However, a cause is not a direct cause when there is a superseding cause. For a cause to be a superseding cause it:

 A. Must come between the original cause and the injury in point of time.

 B. Must not have been brought about by the original fault.

 C. Must turn aside the natural sequence of events and produce a result which would not otherwise have followed from the original fault.

 D. Must not have been foreseeable by the original wrongdoer.

4. By the term "Nishika/LenTec" as used in this Charge, is meant Nishika Ltd., LenTec Corp., American 3D Ltd., and Nishika Manufacturing (H.K.) Ltd.

5. You are the sole judges of whether a witness is to be believed and of the weight to be given to the testimony of each. There are no hard and fast rules to guide you in this respect. In determining believability and weight you should take into consideration as to the witness the following:

 A. Their interest or lack of interest in the outcome of the case.

 B. Their relationship to the parties.

 C. Their ability and opportunity to know, remember, and relate the facts.

 D. Their manner and appearance.

 E. Their age and experience.

 F. Their frankness and sincerity, or lack thereof.

 G. The reasonableness or unreasonableness of their testimony in the light of all the other evidence in the case.

 H. Any impeachment of their testimony.

 I. Any other factors that bear on believability and weight.

 You should in the last analysis rely upon your own experience, good judgment and common sense.

6. Testimony has been presented to you by way of deposition. The testimony of a witness who for some reason cannot be present to testify in person may be presented in this form. Such testimony is under oath and is entitled to neither more nor less consideration by you because it was so presented. You are to judge its believability and weight in the same manner as you would had the witness been present in court except, of course, you should disregard the manner or appearance of the person reading the deposition in court in evaluating the evidence.

7. A witness who has special training, education or experience in a particular science, profession or calling is allowed to express an opinion. In determining the believability and the weight to be given such opinion evidence, you may consider, among other things:

 A. The education, training, experience, knowledge and ability of the witness.

 B. The reasons given for the witness' opinion.

 C. The sources of the witness' information.

 D. Factors already given you for evaluating the testimony of a witness.

Such opinion evidence is entitled to neither more nor less consideration by you than the other fact evidence presented.

8. In deciding the believability and weight to be given the testimony of a witness, you may consider evidence of a statement by or conduct of the witness on some prior occasion which is inconsistent with the witness' present testimony. This evidence may be considered by you only for the purpose of testing the believability and weight of the witness' testimony and for no other purpose. If, however, the statement was given under oath or the witness is a party or an agent of a party in the case, the evidence of the prior inconsistent statement or the conduct of a party or an agent of a party may be considered as evidence bearing on the issues in this case as well as for testing believability and weight.

No objections or exceptions were made against the above parts of the charge.

The critical elements of the charge follow:

### QUESTION NO. 1

Do you find that 3M expressly warranted that the new photographic emulsion would be suitable for making three-dimensional photographs or that the new photographic emulsion would be better than the old emulsion for making three-dimensional photographs? Answer "Yes" or "No."

ANSWER: YES X NO ___

(Instructions Omitted.)

### QUESTION NO. 2

Did 3M breach the express warranty, if any, as to the characteristics of the new photographic emulsion? Answer "Yes" or "No."

ANSWER: YES X NO ___

### QUESTION NO. 3

Was 3M's breach, if any, a direct cause of the harm, if any, suffered by the plaintiffs? Answer "Yes" or "No" as to each plaintiff.

| | | ANSWER: |
|---|---|---|
| A. | Nishika | Yes |
| B. | LenTec | Yes |
| C. | American 3D | Yes |
| D. | Nishika Manufacturing (H.K.) | Yes |
| E. | Ron Harris | Yes |
| F. | Samantha York | Yes |
| G. | Marleone Gunderson | Yes |

### QUESTION NO. 4

Did 3M impliedly warrant the merchantability of the new photographic emulsion and Generation I backcoat? Answer "Yes" or "No."

ANSWER: YES X NO ___

(Instructions Omitted.)

### QUESTION NO. 5

Did 3M breach the implied warranty, if any, that the new photographic emulsion and Generation I backcoat were merchantable? Answer "Yes" or "No."

ANSWER: YES X NO ___

### QUESTION NO. 6

Was 3M's breach of its implied warranty, if any, of merchantability a direct cause of the harm, if any, suffered by the plaintiffs? Answer "Yes" or "No" as to each plaintiff.

| | | ANSWER: |
|---|---|---|
| A. | Nishika | Yes |
| B. | LenTec | Yes |
| C. | American 3D | Yes |
| D. | Nishika Manufacturing (H.K.) | Yes |
| E. | Ron Harris | Yes |
| F. | Samantha York | Yes |
| G. | Marleone Gunderson | Yes |

### QUESTION NO. 7

Did 3M impliedly warrant that the new photographic emulsion and Generation I backcoat would be fit for a particular purpose? Answer "Yes" or "No."

ANSWER: YES X NO .

(Instructions Omitted.)

### QUESTION NO. 8

Did 3M breach an implied warranty, if any, made to Nishika/LenTec that the new photographic emulsion and Generation I backcoat would be fit for a particular purpose?

ANSWER: YES X NO ___

## QUESTION NO. 9

Was 3M's breach of an implied warranty, if any, to be fit for a particular purpose a direct cause of the harm, if any, suffered by the plaintiffs? Answer "Yes" or "No" as to each plaintiff.

| | | ANSWER: |
|---|---|---|
| A. | Nishika | Yes |
| B. | LenTec | Yes |
| C. | American 3D | Yes |
| D. | Nishika Manufacturing (H.K.) | Yes |
| E. | Ron Harris | Yes |
| F. | Samantha York | Yes |
| G. | Marleone Gunderson | Yes |

## QUESTION NO. 10

Did Nishika/LenTec fail to exercise reasonable care in evaluating and using the new photographic emulsion together with the Generation I backcoat?

ANSWER: YES X NO ___

(Instructions Omitted.)

## QUESTION NO. 11

Was Nishika/LenTec's failure, if any, to exercise reasonable care in using the new photographic emulsion together with the Generation I backcoat a direct cause of its harm, if any, suffered by the plaintiffs?

ANSWER: YES X NO ___

## QUESTION NO. 12

Taking the combined fault which contributed to Nishika/LenTec's damages as 100%, what percentage thereof do you attribute to:

| A. | 3M | 51% |
|---|---|---|
| B. | Nishika/LenTec | 49% |
| | **TOTAL** = | 100% |

(Instructions Omitted.)

## QUESTION NO. 13

What sum of money, if any, would fairly and reasonably compensate the plaintiffs for damages, if any, suffered as a direct and natural result of 3M's breach of warranty, if any? Answer in dollars and cents for each plaintiff, if any, and without any reduction for any percentage of fault or causation you might attribute to such plaintiff.

| ANSWER: | |
|---|---|
| Nishika/LenTec | $50,000,000 |
| Ron Harris | $ 0 |
| Samantha York | $ 0 |
| Marleone Gunderson | $ 0 |

(Instructions Omitted.)

## QUESTION NO. 14

Was the multilevel marketing system used by Nishika/LenTec illegal under Minnesota law? Answer "Yes" or "No."

ANSWER: YES ___ NO X

(Instructions Omitted.)

### 3M's Objection to the Court's Charge

■ The 3M Corporation objected to the court's charge orally with permission. The objections are summarized, using the verb tenses. 3M objected and excepted to question one and the instructions with it, stating question one, as submitted, is a source of confusion to the jury because the question is worded in the disjunctive. 3M also objected that question one inquiries about warranties about which the plaintiffs really have not shown a complaint. These objections and exceptions were to the effect that the plaintiffs complained that the new emulsion that was sold was incompatible with the material that had already been purchased and received by either LenTec or by Nishika. Then 3M repeated that question one is a source of confusion and is not supported by the evidence in the case.

■ Additionally, there was an objection to the instruction with question one because it was said that the instruction included only a portion of the "description of how express warranties are made" under the Minnesota statute which description failed to include the fact (or instruction) that a *sample or a model,* which is made a part of the basis of the bargain, creates an expressed warranty that the whole of the goods shall conform to the sample or the model. Thus the instruction (it was said) puts undue emphasis and acts as a comment to the jury that the warranty of the defendant was other than *the warranty that was actually made to the effect that the goods will conform to the sample.* 3M also objected and insisted that having given to the plaintiffs a sample and allowed the plaintiffs to examine, test and satisfy themselves that

the goods or sample were satisfactory for plaintiffs' purposes; then there exists no other warranty or breach of warranty about which the *plaintiffs can complain.* Then 3M said, as a matter of law, the issue should not be submitted to the jury.

We determine that *there was no comment.* Certainly TEX.R.CIV.P. 277 was not violated. The trial judge said nothing about the weight of the evidence. He did not advise the jury of the effect of its answers. The parties here had ample time and opportunity to present their objections to the court's charge outside the presence of the jury. Clearly all objections not so presented shall be waived. TEX.R.CIV.P. 272. The trial court may give such definitions and instructions as may be proper. TEX.R.CIV.P. 273. Significantly, no objection to one part of the charge may be adopted or applied to any other part of the charge by reference only. In all jury cases, the court shall, whenever feasible submit the cause upon broad form questions. The court shall submit such instructions, definitions as shall be proper *to enable the jury to render a verdict.* Rules 273, 277. We determine that the court was permitted under Rule 277 to submit a question disjunctively and in a broad form. A very well recognized corollary is that the court's charge shall not be objectionable on the grounds that it may incidentally constitute a comment on the weight of the evidence or advise the jury of the effect of their answers when it is properly a part of an instruction or a definition. Rule 277. Neither comment nor the effect of the jury's answers existed.

We conclude that the objection that question one is a source of confusion is not sustainable and the objection that the question is worded in the disjunctive is not sustainable. Rule 277. We conclude that question number one was supported by the evidence. The next objection of 3M to question number one according to the record, seems to be adverse and unfavorable to the position of 3M. We opine that this next objection thwarts and diminishes 3M's defensive position. The objection states:

Additionally, within the instruction to include only a portion of the description of how expressed warranties are made from the Minnesota Statute, 336.2–313 without including the fact that a sample or a model, which is made part of the basis of the bargain, creates an expressed warranty that the whole of the goods shall conform to the sample or model puts undue emphasis and acts as a comment to the jury that the warranty of the plaintiffs or warranty, rather, of the defendant was other than the warranty that was actually made, and that is that the goods will conform to the sample. And on that basis the defendant also objects that having given the plaintiff a sample and allowed the plaintiff to—to examine, test and satisfy itself that the goods were—were satisfactory for its purposes, there is no other warranty or breach of warranty about which the plaintiff can complain, and as a matter of law the issue should not be submitted to the jury.

This objection on the part of 3M contains more than one element or complaint or objection; it is multifarious.

The court's charge included this instruction:

11. With certain questions contained in this Charge, you will be concerned with the relationship that exists between a business entity and its officers or other agents. Some of the Plaintiffs, Nishika Ltd., LenTec Corporation, American 3D Ltd., and Nishika Manufacturing (H.K.), and the Defendant, Minnesota Mining and Manufacturing Co. (3M), are business entities that can acquire knowledge and can act only through its officers or agents. The law therefore holds a business entity responsible for all acts of its directors, officers, employees, or other agents, which were done within the course or scope of their authority or employment. The term "course or scope of authority" means any act or acts done in the furtherance of the entity's business by an officer or agent.

There are no objections to this instruction and there is also no objection to the charge on that basis.

Rule 277 affirmatively authorizes and mandates broad-form submission of jury questions. *See Keetch v. Kroger Co.*, 845 S.W.2d 262 (Tex.1992). We are, of course, to evaluate the sufficiency of the evidence in view of the actual questions and instructions contained and submitted in the court's charge. *See Larson v. Cook Consultants, Inc.*, 690 S.W.2d 567 (Tex.1985).

But there were no samples or models that were even referred to in the instructions to question number one. It is very important to note that the defendant did not object to the definition of direct cause and did not object to direct cause as used in questions number three, six, and nine. One defendant lawyer did not want the charge to be changed at all after the Friday conference which was supposed to close the charge and did actually close the charge. 3M did not object to the damage issue at first. Later on, one of the attorneys, Mr. McEvily, wanted the Friday charge but later he objected to the new submission as of Monday morning on December 21, 1992.

■ The objections to question thirteen were that the court was advising the jury of the effect of its answers. That objection had nothing to do with the apportionment of the damages between the plaintiffs. We find that objection is not tenable. We note that the trial judge was merely following the Texas Pattern Jury Charges. There was another objection to the order of the last three issues as presented to the jury and this would cause the jury to leave unanswered certain questions.

There were many irrelevant, abstruse objections. We conclude that 3M's objections to question thirteen—the money damage issue—are not sustainable. Without objection the court's charge on causation (which was correct under Minnesota law and standards for determining who may recover for breach of warranty) definitely involved the term "direct cause". The court charged the jury:

> By the term "direct cause" as used in this Charge, is meant a cause which had a substantial part in bringing about the harm, either immediately or through happenings which follow one after another, incurred by any person or entity who may

reasonably be expected to use, consume or be affected by the 3M photographic materials.

It must be stressed that the jury answered questions number three, six, and nine wherein the jury affirmatively found that 3M's warranty breaches were a "direct cause" of the "harm" suffered and sustained by *each one of the Nishika Plaintiffs*. Therefore, pursuant to the trial court's definition of "direct cause", the jury appropriately and specially found that each one of the Nishika Plaintiffs could reasonably be expected to use, consume, or be affected by 3M's defective materials. 3M's objections to question thirteen are not sustainable.

■ Furthermore, question thirteen was properly presented and properly worded under the broad-form submission that is mandated by the civil rules. Rule 277. *See Keetch v. Kroger Co.*, 845 S.W.2d 262 (Tex. 1992) and the concurring opinion, holding, in general, that the broad-form question involves inclusion of multiple elements within a single question, usually by adding accompanying instructions. The majority opinion in *Keetch* is supportive of the doctrine. The Texas appellate courts, under established rules of appellate review, pass on the sufficiency of the evidence in light of the questions actually asked and the instructions actually submitted in the court's charge. *See Larson v. Cook Consultants, Inc.*, 690 S.W.2d 567, 568 (Tex.1985). Reasoning from those decisions and in view of the fact that the jury found, without any objection, that each of the Nishika Plaintiffs might reasonably have been expected to be affected by 3M goods and that each of the Nishika Plaintiffs suffered direct harm as a result of 3M's breaches; then all of Nishika Plaintiffs are entitled to recover under Minnesota law. MINN.STAT. § 336.2–318 (Supp.1993). Again, defendants' objections to question thirteen are untenable.

■ As we read the language of MINN. STAT. § 336.2–313, the part of that statute relied upon by 3M as the grounds of its objection to question one is misconstrued. We determine that the appropriate statute relied upon by 3M in its objection to question number one reads thus:

[W]hen the buyer before entering into the contract has examined the goods or the sample or model as fully as he desired or has refused to examine the goods there is no *implied warranty* with regard to defects which an examination ought in the circumstances to have revealed to him. (Emphasis added.)

But this clause is in section 2–316. 3M was invoking the "sample or model" defense. Again, we opine the immediately above recited statutory provision applies to implied warranties but jury question number one inquired strictly about *express warranties.* We think that 3M misconstrued section 2–313(c) reading:

Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

We think that that is an affirmative ground or basis to create an express warranty as against the seller (3M) and in favor of the buyer. We think 3M has tried to turn this affirmative ground of creating an express warranty in favor of plaintiffs into a complete defense in favor of defendants. 3M, in our opinion, is in error. 3M was trying to apply certain language above quoted that *applies only to implied warranties* as creating an additional, complete defense as to express warranties—this objection was skewed. We cannot agree with 3M. We rule that 3M misconstrued section 2–313 as well as 2–316(3)(b). Section 2–313 is not a ground of defense for 3M. Section 2–313 defines how express warranties are "created" in favor of buyers; it gives no help or comfort to seller. We think 3M not only misconstrued but misapplied the relevant section of 2–316 because that relevant sub-section 2–316(3)(b) applies to implied warranties. 3M attempts to apply this sub-section (3)(b) to express warranties. Thus the objections are not sound.

■ Then 3M requested Questions A and B. They are:

### QUESTION NO. A

Do you find that 3M expressly warranted that the new photographic emulsion would be compatible with the backcoat for making three-dimensional photographs?

### QUESTION NO. B

Do you find that 3M expressly warranted that the new photographic emulsion would be suitable for making three-dimensional photographs.

Both of these were refused. Significantly, no point of error is presented germane to Questions A and B. But neither defendant's Questions A nor B inquired about samples or models or if samples or models are fully examined by a buyer before entering into a contract or if the buyer has refused to do so; then there is no *implied warranty* with regard to the defects which an examination ought in the circumstances to have revealed to the buyer. Defendant's Questions A and B simply do not touch samples or models top, side, nor bottom. Obviously 3M repeatedly insists by the wording of its objections that section 2–316(3)(b) mandates and creates a defense and exclusion to express warranties; it does not; it applies solely to implied warranties.

This, we opine, was confusing to the trial court and we think such objection was not sound. And we think these objections coupled with the defendant's requested Questions A and B were confusing and violated Tex.R.Civ.P. 274 concerning objections. As to jury question number one, we rule that the defendant's objections were not efficacious.

■ Next, 3M objected to question number two in that question number two follows from question number one but inquires (3M argues) about a breach without regard to the two specific items that are listed in question number one and inquires of the jury whether or not they find a breach as to characteristics of the photographic emulsion without being the characteristics that were—that the jury would find warranted in number one. As such, 3M says question two allows that the jury to consider characteristics that the jury has not found to be warranted. Question two had a correct predicate.

We have held that 3M's objections to question number one, itself, are not valid. It is

noteworthy that question number one concerning express warranties inquires about whether the new photographic emulsion would be suitable for making three-dimensional photographs or that the new photographic emulsion would be better than the old emulsion in making three-dimensional photographs. Those were the only two alternatives submitted in jury question number one. Jury question number two simply inquires if 3M breached the express warranty, if any, as to the characteristics of the new photographic emulsion. The inquiry in question two was limited to the new photographic emulsion. This was in harmony and appropriate in view of jury question number one. Broad-form questions are favored. Rule 277. 3M's objection to question number two is not sound. Moreover, the wording of jury question number two, we decide, restricts the jury to the consideration of the new emulsion as set out in question number one. The jury was not allowed or was not authorized to consider other different, separate, and independent characteristics. No error is shown.

■■■ Next, 3M objected to the submission of question number three in this:

We object to the submission of Question No. 3 which is a damage question predicated on No. 1 and 2 on a number of bases, Your Honor. As to all defendants except Nishika and LenTec, we object because they—it would—

THE COURT: All plaintiffs.

MR. SINGLETON: All plaintiffs.

MR. McEVILY: I'm sorry. Let me correct that.

As to all plaintiffs except Nishika and LenTec, we object and except because the question would grant damages to remote purchasers in that none of the plaintiffs other than Nishika or LenTec were purchasers from 3M and would allow consequential damages for—for these remote purchases which are not permitted under the form of the Uniform Commercial Code that has been adopted in Minnesota.

Then, counsel for 3M, we opine, conceded that Minnesota along with four other States adopted the most liberal provisions of section 2–318, thereby not requiring any privity.

But, the objections further stated that in this case the plaintiffs listed (other than Nishika and LenTec) have shown no property damage and no personal injury and the objection went further and stated that the drafters of section 2–318 have indicated that the extensions to remote purchasers goes only as far as section 402A of the RESTATEMENT (SECOND) OF TORTS, and what the plaintiffs have attempted to do in this case is to exceed that boundary. We disagree with this objection. After all, question three asks individually and especially about each plaintiff. It asks if 3M's breach was a direct cause of harm to each plaintiff. This litigation is not grounded on section 402A.

Furthermore, we are decidedly of the view that under the Minnesota law, property damage and personal injuries and damages are not a prerequisite to recovery. *The term "direct cause" was not objected to.* It is a cause which had a substantial part in bringing about the harm, either immediately or through happenings which follow one after another incurred by any person or entity who may reasonably be expected to use, consume, *or be affected by the 3M photographic materials.* This totally unobjected-to definition of "direct cause" is based squarely on the Minnesota Statute reading that a seller's warranty whether express or implied extends to any person who may reasonably be expected to use, consume, *or be affected by the goods and who is injured by the breach of the warranty.* Also a seller may not exclude or limit the operation of this section of the Minnesota law. 3M's objections to question two and three are not sustainable. The plain language of Minnesota statute does not require property damage or personal injuries. Minnesota performed an orchidectomy on its enacted version of section 2–318. Minnesota after radical surgery on the UCC enacted this:

**Alternative C**

A seller's warranty whether express or implied extends to any person who may reasonably be expected to use, consume or be affected by the goods and who is injured by breach of the warranty. *A seller may not exclude or limit the operation of this section.*

**Minnesota.** In Alternative C, omits "with respect to injury to the person of an individual to whom the warranty extends". 1A UNIFORM LAW ANN., UCC, MASTER ED. 557–9 (1989). Thus, 3M's objections to question number three are not sustainable.

We determine that there is a complete ground of recovery from the standpoint of liability in favor of the appellees and adverse and unfavorable to 3M, based on the jury's answers to one, two, and three.

■ Next, we review the objections to question number four. 3M objected to question number four by stating that there was no evidence, it being established as a matter of law that a sample was provided to the plaintiffs. Also 3M said it was uncontested by the plaintiffs that they had an opportunity to test it and examine it as much as "they" wanted and on this basis, question number four should not be submitted. For the same reason 3M objected to question five on the basis that a sample was submitted to the plaintiffs and therefore the plaintiffs could not obtain recovery on an implied warranty. 3M objected to question number six on the same basis as 3M objected to question five. This is objection by reference and is not permitted under Rule 274. Hence, this objection is not an appealable, preserved objection as to question six.

■ 3M then objected to question number six pronouncing it was the proximate cause question; proximate cause is not mentioned in question number six. 3M objected to question seven "for the same reason". Query: Is not this objection by reference? We think that those are the same objections by reference to six and five. The objection to six is affirmatively erroneous. Question seven was also objected to by 3M in that it inquires about implied warranties "which were specifically disclaimed by the unrefuted evidence to the effect that the plaintiff had received a sample and examined it and tested it as fully as it desired." That exclusion or modification was given to the jury by instruction to questions four and seven. Under the record, this issue became a jury question. 3M lost that issue. That defensive instruction (quoted above) given to the jury twice—once in question number four and again in question number seven. 3M simply did not prevail with the jury.

■ 3M further contends: "We object to Question No. 8 on the basis, there being no evidence following from our objection to Question No. 7." Again, an objection by reference disallowed by the rules. And again 3M objected to question nine in that it would permit remote *purchasers* of the defective, unfit, incompatible products to recover for damages that are not permitted under the code. We simply disagree. *The Minnesota law, as we perceive it, is definitely to the contrary. See* § 2–318. And the *direct cause* definition is paramount on causation. The "direct cause" doctrine and definition were correct and they established the substantive theories of the case in this litigation.

To question number ten, 3M objected on that same basis; that is, that the remote purchasers are permitted to recover beyond the recovery that is permitted to them under the code. Again, this is an objection by reference. We have explained why this objection is not valid above. But ten apparently was later changed. The above concluded all objections from 3M. 3M presented certain refused questions and refused instructions. No error is assigned or complained of on appeal as to their requests. The charge was closed. 3M's contention as to remote purchasers is not sound under the Minnesota law or the theory upon which the case was tried. 3M's able counsel did object for the failure to submit the questions that had been submitted to the court identified as Defendant's Questions C, D, E, F, G, H, I, and the Defendant's Proposed Instruction J all of which have been refused by the trial court. That concluded all objections and exceptions to the court's charge. No point of error is presented to us concerning C, D, E, F, G, H, I, or J. Waiver and unappealability resulted.

Question number four asked if 3M impliedly warranted the merchantability of the new photographic emulsion with the backcoat. 3M objected on the basis that there is no evidence and it has been established as a matter of law that a sample was provided to the plaintiffs and that it was uncontested by the plaintiffs that "they" had an opportunity

to test it—examined it as much as "they" wanted to. On that basis, 3M contends question four should not be submitted. We disagree. There were clear, correct instructions given in connection with question four. One of the instructions read:

> When the buyer before entering into the contract has examined the goods or the sample or model as fully as he desired or has refused to examine the goods there is no implied warranty with regard to defects which an examination ought in the circumstances to have revealed to him.

We confidently decide that 3M's total objections to question number four were actually fully met and complied with by the trial court's clear instructions. Question four was for the jury. Under this record, 3M lost the issue with the jury. The other prong of the attack is that there was no evidence. We hold to the contrary.

Under the settled rules of appellate review we can look only at the evidence that is favorable to the jury's verdict and all reasonable inferences that flow therefrom. We must totally close our eyes and not consider the evidence that is contrary to the verdict and we must close our eyes to and not consider any inferences flowing from the contrary evidence. Then for the very same reasons by reference 3M objected to question number five. This is simply an objection by reference which is disallowed. But looking at it as a live objection based on a "sample" defense, it is noted that the court clearly and properly instructed upon that defense.

We have determined that the objections to question number five are not valid or sustainable. Then 3M says this: "We object to Question No. 6 which on the same basis that we objected to Question No. 5." Again, that is a reference objection, not good under the rules. Then, 3M says, "... being the—the proximate cause question that goes with Question No. 5 *and there was no evidence that would justify its submission to the jury.*" Again, we must disagree. Under the well recognized appellate decisions, this is a "no evidence objection" sometimes also referred to as a "legal insufficiency" objection. 3M is wrong.

All of the objections to the series of issues four, five, and six basically complain of the "sample" defense or "no evidence". None of the objections specifically attack whether 3M breached the implied warranty, if any, *that the new photographic emulsion and the backcoat were merchantable.* But, the Statutory section 2–316(2) specifically provides in order to exclude or to modify the implied warranty of merchantability or any part of the implied warranty of merchantability, the pertinent, relevant language must contain and mention merchantability. The invoices relied upon lack the required wording. Invoices were the basis of this group of objections. And the wording must be conspicuous. *We find that there was no exclusion or modification of the implied warranty of merchantability.* 3M's objections failed to complain or mention merchantability. On a separate, independent basis we find in this case that any such writing on invoices was not conspicuous. We find and hold that the objections and exceptions to four, five, and six were not efficacious and we hold the answers to four, five, and six form a independent, separate, distinct and additional complete ground of recovery for Nishika Plaintiffs as to liability and damages.

We must note again that 3M objected to question number six pronouncing it was the proximate cause issue. It is a question that goes with number five and there is no evidence that would justify the submission of six to the jury. *3M objects to six on the basis that it is the proximate cause question.* The simple answer to those objections is that question six is not a proximate cause question in any sense and the phrase proximate cause is nowhere set out in question six.

The same reasoning and rationale by 3M were the grounds of the objections to question number seven. It was the so-called "sample" defense that the plaintiffs had examined the sample and tested it as fully as desired. That correct "sample" instruction was clearly set out in the instructions to question four (as noted above) and was also made fully applicable by the charge to question seven. Then, 3M's only objection to question number eight is that there was "no evidence" and the only objection to question

number nine is that it would permit remote purchasers to recover for damages not permitted under the code. We conclude that 3M's objections and exceptions to questions number seven, eight, and nine are not sustainable and these three issues and answers thereto form a complete, separate, and independent basis of recovery under the theory that *there was a breach of an implied warranty* that the new photographic emulsion and the Generation I backcoat would be fit for a particular purpose. These two materials were not fit for a particular purpose and the jury so found, acting well within its powers. There was no objection to the instruction that followed question number seven which reads:

> Where the seller at the time of the sale has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is, unless excluded or modified as described in the instructions to Question No. 4, an implied warranty that the goods shall be fit for such purpose.

By that instruction, the "sample" defense, having been clearly set out in number four and having been clearly encompassed and included in question seven, simply made the defendant's objections ineffective. Clearly, the "no evidence" objection to question number eight is not tenable under this record and the objection to number nine is simply erroneous under Minnesota statutory law. This case, as well as question nine, was submitted on the concept that 3M breached an implied warranty concerning fitness for a particular purpose which breach thereof (as the jury found) was a direct cause of the harm, if any, suffered by the plaintiffs. 3M did not object to the direct cause definition as being the correct causation standard. A modern jury can follow the plain, simple and unequivocal instruction to question number seven.

We note that there is no objection to the definitions which proceeded jury question number one. We discern that no objection whatsoever was made to any of the general instructions set out on pages two and three of the court's charge.

The December 18, 1992 charge conference was definitely closed. The first set of objections were taken on December 18, 1992.

There were some minor typing errors corrected and new questions framed over the weekend. On the following Monday morning, December 21, Mr. Wilson said:

> MR. WILSON: Your Honor, the evidence came in and we presented the evidence where you take out all the intracompany sales and transfers. You look at it. We looked at all four as a single economic unit, and that's the way we would like to submit that, as a single unit.

New question eleven inquired if Nishika/LenTec's failure to exercise reasonable care in using a new photographic emulsion together with the backcoat was a direct cause of harm suffered by the plaintiffs. The jury answered "Yes." As to new question number twelve, asking about the apportionment of fault, 3M had no objection to grouping the plaintiffs under Nishika/LenTec, which were found to be 49 percent at fault. It should be noted again that in the unobjected-to definitions, definition number four reads:

> By the term "Nishika/LenTec" as used in this Charge, is meant Nishika Ltd., LenTec Corp., American 3D Ltd., and Nishika Manufacturing (H.K.) Ltd.

Note also that the judge instructed the jury as follows, "You are the sole judges of whether a witness is to be believed and of the weight to be given to the testimony of each."

■ There are objections to new question thirteen which is the money damage issue. The objections, as we read them, are that there is evidence that *some* of the Nishika/LenTec plaintiffs may be entitled to recovery on some theories and under some causes of action, whereas others cannot and the submission as phrased in thirteen will make it impossible for the trial court to know which of the Nishika/LenTec plaintiffs the jury awarded damages to. Also, since there are some of the Nishika/LenTec plaintiffs concerning which there is no evidence that they could recover damages, then question number thirteen is improperly phrased and thus each plaintiff should be broken out.

We determine that the objections to thirteen do not advise the trial court as to which of the plaintiffs may be entitled to recover on some theories or some causes of action and which of the plaintiffs are not entitled to recover under some theories or some causes of action. The objection is not distinct. Rule 274. Waiver results. But, 3M did not object to the "Nishika/LenTec" designation when it came to the comparative fault questions and 3M was willing to accept the entire 49 percent finding of fault adverse to Nishika/LenTec. 3M was found to be 51 percent at fault. Basically, the later objections on Monday, December 21, 1992, to thirteen can be summed up in that there are some of the Nishika/LenTec plaintiffs concerning which there is no evidence that they could recover damages alleged by the plaintiffs—but which plaintiffs. This again is a "no evidence" objection. We conclude that there was evidence of probative value and force favorable to and actionable by the four companies under the Minnesota law.

### The Last Objections to Question Thirteen

These objections if followed by the court would have caused a conflict in this: the direct cause definition is not objected to and the instructions were not objected to. The definition number four covering Nishika/LenTec incorporated the other two plaintiffs—no objection was lodged. If the court followed the defendant's later objection to thirteen, the court would have listed Nishika/LenTec which had been defined in the general definitions as covering all four plaintiffs and if the court would have listed separately American 3D and Nishika (H.K.) (as desired by 3M) the jury would have been confused. Following that requested submission, the jury would have answered Nishika/LenTec damages as covering all four plaintiffs and *in addition thereto* the jurors would have listed and awarded the damages, cumulatively, additionally, and duplicatively as to American 3D and as to Nishika (H.K.), thereby creating a double recovery or at least a duplication with overlapping recoveries. 3M's objections to question number thirteen are overruled; they would have led to error. Without criticism of any party, the objection to thirteen tended to invite error.

### Summary of Minnesota Law

■ The trial court properly concluded that Minnesota law governed the substantive law aspects of this litigation. Under landmark decisions in our jurisdiction, the selection of the correct substantive law for contract causes of action is determined by references to the "most significant relationship" test as set out in sections 6 and 188 of the RESTATEMENT (SECOND) OF THE CONFLICT OF LAWS. In determining which State's law should govern the construction of contractual rights, our Texas Supreme Court has looked to the principles set out in the RESTATEMENT (SECOND) OF CONFLICT OF LAWS (1971). See *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 678–680 (Tex.1990), *cert. denied*, 498 U.S. 1048, 111 S.Ct. 755, 112 L.Ed.2d 775 (1991); See and compare *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 421 (Tex.1984). Our Supreme Court in a recent case has looked with favor upon section 188(1) of the Restatement pronouncing the sound and general rule:

> The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6.

*Maxus Exploration v. Moran Bros.*, 817 S.W.2d 50, 53 (Tex.1991).

Section 188 enumerates the contacts comprising the relationship between the transactions and the local laws ordinarily to be taken into account in applying the principles in section 6. These principles include for example: a) the place of contracting, b) the place of negotiation of the contract, c) the place of performance, d) the location of the subject matter of the contract, and e) the domicile, residence, nationality, place of incorporation, and place of business of the parties.

Thus, the State with the most significant relationship to the contract and to the transaction and to the parties, we conclude and hold is the State of Minnesota. See and compare *Duncan v. Cessna Aircraft Co.*, supra; *Gutierrez v. Collins*, 583 S.W.2d 312,

318 (Tex.1979); *Maxus Exploration, supra.* Significant and important in evaluating the contacts is the relevancy and relative importance with respect to the issues involved.

Clearly, Minnesota had the most significant relationship to the business dealings, transactions, and contractual matters occurring in Minnesota and giving rise to this litigation. We conclude the trial judge was right that the State of Minnesota and Minnesota law possesses the "most significant relationship" to this case.

The following factors are of compelling and cogent significance. 3M's corporate headquarters and principal place of business are both located in Minnesota. The important meeting held in January of 1988 that formed the genesis and the basis on which the parties went forward and conducted their affairs over the next approximately two years or more, occurred in Minnesota.

This very important meeting was the one in which Bainbridge explained the family of companies as well as the multi-million dollar investments that had been made and the tens of millions of dollars of investments that had been planned to be invested in the future as well as the mode and manner in which the progress and course of business would be executed. These meetings and these conversations took place in Minnesota. A certain meeting in January of 1988 and the follow up meetings in August and December of 1988 also were situated in Minnesota.

In July of 1988, Nishika ordered its first installment of photographic material from 3M by sending an order to 3M in Minnesota. The order was filled and executed in Minnesota. The negotiations and dealings for each batch of photographic materials and the purchase of the said materials between Nishika/LenTec and 3M occurred in Minnesota or in some cases by telephone communications with 3M officials in Minnesota and these telephone negotiations were acted upon by 3M officials in Minnesota and the photographic materials were manufactured and prepared in Minnesota.

One of the most important and crucial products that was supplied by 3M, being the backcoat for the three-dimensional photo-graphs, was developed within Minnesota and was manufactured for 3M by a subcontractor located in Minnesota and was tested in 3M's facilities in Minnesota. 3M's efforts, attempts, and workings to correct the problems caused by the failure of its photographic materials were conducted by engineers and employees located at 3M's Minnesota facilities.

■ If the place of negotiating the contract as well as the place of performance occur within the same State, then the local law of that State will usually and customarily be applied. 3M conducted its research, manufacturing, testing, and shipping of its production in Minnesota. Certain choice of law principles are meaningful and cogent. Among them are the needs of interstate systems, the relative interest of those States in the determination of the particular issues, and importantly, the protection of justified expectations as well as the basic policies underlying the particular field of law. RE-STATEMENT (SECOND) CONFLICT OF LAWS § 6(2) (1971).

Under the circumstances surrounding the dealings and contractual relationships under this record, 3M cannot challenge the trial court's determination that Minnesota had the most significant relationships to this legal dispute and this litigation. Therefore, Minnesota law should be applied. 3M was headquartered in Minnesota and would logically and naturally be more acquainted with and cognizant of Minnesota law than the law of any other jurisdiction—especially those far away. 3M cannot argue that it is somehow inappropriate, unjust, or prejudicial to apply Minnesota law to a Minnesota company headquartered in Minnesota and whose plant and facilities are located in Minnesota. 3M's home state is Minnesota; the application of home state law to 3M is correct, fair, and just. We conclude and hold that Minnesota law governs the substantive aspects and issues of this litigation.

■ But 3M contends that two of the Nishika Plaintiffs, being American 3D which marketed and sold the 3–D cameras, and Nishika (H.K.) which manufactured the cameras were not in the chain of distribution of 3M's defective products. Therefore, 3M ar-

gues these two cannot recover lost profit damages. The corollary contention of 3M is that inasmuch as the jury was not asked to apportion damages among the Nishika Plaintiffs that the judgment cannot stand.

But 3M's position runs contrary to the Minnesota law.

The Uniform Commercial Code as set out in the Uniform Laws Annotated, Master Edition shows that Alternative C was adopted by Minnesota. Minnesota adopted the same Alternative C of section 2–318 but omitted the last fifteen words. This Alternative C provides:

**Alternative C**

A seller's warranty whether express or implied extends to any person who may reasonably be expected to use, consume or be affected by the goods and who is injured by breach of the warranty. A seller may not exclude or limit the operation of this section with respect to injury to the person of an individual to whom the warranty extends. As amended 1966.

But Minnesota deleted thusly:

**Minnesota.** In Alternative C, omits "with respect to injury to the person of an individual to whom the warranty extends".

The deletion of the last fifteen words expands, enhances and makes much broader Alternative C. Thus, under the appropriate Minnesota law a seller's warranty, whether expressed or implied extends to any person who may be reasonably expected to use or consume *or even to be affected by the goods and who is injured by the breach of the warranty*. Significantly, a Minnesota seller may not exclude or may not even limit the operation of this bobtailed section 2–318. This law is broad, expansive, and far reaching. But the Minnesota legislature so decreed.

▮ Clearly then under the record, American 3D and Nishika (H.K.) are well within the purview and parameter of language and wording of the bobtailed Alternative C as adopted by Minnesota. Under Minnesota law *privity of contract is not a* prerequisite for recovery of an action for a breach of warranty. See *SCM Corp. v. Deltak Corp.*, 702 F.Supp. 1428 (D.Minn.1988).

The four companies involved were very interdependent and this close relationship was explained to 3M.

### The Issue of the Nishika Plaintiffs' Harm

3M places paramount reliance on *Willmar v. Short–Elliott–Hendrickson*, 512 N.W.2d 872 (Minn.1994). That case dealt with an engineering firm's cross claim for contribution and indemnity against a manufacturer and the central question was whether the cross claim was thus subject to and barred by the four year limitation period under the Uniform Commercial Code (UCC). The nature of the cross-claim by the engineers was founded upon an equitable proposition that the engineering firm had paid more than its fair share of the common liability and thus the engineer's cause of action was based on an equitable principle and not on the contract for the sale of goods within the province of the UCC. *Willmar* is inapposite.

The engineering firm was not interrelated to other companies or firms involved. It was not dependent for its on-going business life upon the manufacturer's products. Our case, sub judice, is vastly different and distinguishable because American 3D and Nishika (H.K.) were related closely and interdependently with the other two companies and their on-going business life was interdependent on the other two companies. All four companies were totally and in actuality dependant upon the products such as the backcoat sauce and the other photographic materials manufactured by 3M.

It is noteworthy and important that the seller's warranty, even the implied warranty as well as the express warranty, extends to any person who may reasonably be expected to use, consume, or even be affected by the goods. MINN.STAT. § 336.2–318 (Supp.1993). Thus, the Nishika Plaintiffs were reasonably expected to be affected by 3M's officials and 3M's products and they were injured by 3M's breach of both its expressed and implied warranties. The jury so specifically found. One noted commentator has observed and written:

Alternative C *completely* eliminates vertical privity requirements [ (persons in the

chain of distribution)] and probably does the same with respect to horizontal privity [(persons outside the chain of distribution)].... Under these definitions *it is difficult to imagine any kind of entity that would be excluded from being a plaintiff under Alternative C.* (Emphasis added.)

HAWKLAND, UCC SERIES § 2–318:04 at 674–75 (1992).

### *The Foreseeability Issue*

■ In this litigation, the jury found that all of the Nishika Plaintiffs could reasonably have been expected by 3M to use, consume, or be affected by 3M's goods and products which the jury found to be defective. In view of the jury's verdict, 3M cannot prevail in its contention that the Nishika Plaintiffs' harm was not foreseeable.

In *Willmar, supra,* the court summed up by saying that Short–Elliott's (the engineers) cross-claim for contribution indemnity against the respondent, Clow Corporation, is simply not subject to the UCC's four year statute of limitation. Of course, it is evidenced by its own holding and language that the Supreme Court of Minnesota failed to give the coup de grace to the holding in *Housing & Redev. Auth. v. Agassiz Const.,* 476 N.W.2d 781 (Minn.App.1991) that the seller's warranties extended to persons affected by the breaches of warranties. *Agassiz Const.,* as to this appeal, is still authoritative. The *Willmar* decision set out that the trial court did err when it applied MINN.STAT. § 336.2–725 to bar the appellant's indemnity claims. Section 336.2–725 is a limitation statute. *Willmar* addressed only the statute of limitation question.

A basic change took place in 1969 under the new Minnesota law. MINN.STAT. § 336.2–318. *Church of the Nativity v. Watpro, Inc.,* 474 N.W.2d 605 (Minn.App.1991), *aff'd,* 491 N.W.2d 1 (Minn.1992). *Willmar v. Short–Elliott–Hendrickson, supra,* did not overrule *Church of the Nativity* case. In ·*Willmar,* the Supreme Court of Minnesota wrote that whether *Short–Elliott* as a consultant and engineer was a privity with the *City of Willmar* and its general contractor (Clow Company) (who were in the chain of title for the

component parts by the Clow Company) was immaterial.

We fail to conclude that the Minnesota courts have made a distinction between vertical or horizontal distributions as contended by 3M. Not only does the *Lloyd F. Smith Co. v. Den–Tal–Ez, Inc.,* 491 N.W.2d 11 (Minn.1992), case fail to mention horizontal distribution or vertical distribution but indeed holds and reasons that "[t]he warranty protection of a sales contract extends to sub-purchasers of the defective product and to third parties in privity, *indeed, to 'any person who may reasonably be expected to ... be affected by the goods and who is injured by the breach of warranty'.* MINN.STAT. § 336.2–318 (1990)." (Emphasis added.) *Id.* at 14. *Lloyd F. Smith* is not overruled. American 3D and Nishika (H.K.) do not deal as merchants or sellers of 3M's emulsions or backcoat and, indeed, in *Lloyd F. Smith* the Minnesota Supreme Court held that the UCC provides a remedy for other property damages rising out of the sales of goods. Here, there was other property damage in that the photos faded. We conclude that *Willmar* does not overrule the *Lloyd F. Smith* case nor does the holding in *Willmar* deny relief to American 3D and Nishika (H.K.) But, the record before us is even more compelling because 3M knew·and had cause to know of the intimate interdependency of the four companies and the millions spent and to be spent on developing a worldwide distribution system for the three-dimensional photography system.

3M actually knew that the four companies would use and would be affected by 3M's products, especially the emulsion and. the backcoat sauce. There was much more than an expectation to use or to be affected by 3M's products. The mere expectation is all that is required by the plain statutory language of Alternative C of section 2–318. Therefore, 3M's reliance on the *Willmar* case is not sound. Nothing in that case overrules the holding in *Lloyd F. Smith Co., supra.* The Minnesota warranty protection of a sales contract extends to sub-purchasers as well as purchasers of defective products and to the third parties and, indeed, to anyone or any person who may reasonably be expected to

be affected by the products and who is injured or harmed by the breaches of the warranties. Thus, there was no error in the submission of question thirteen.

*Furthermore,* an affected plaintiff is not precluded from recovery for consequential damages because of the lack of privity of contract. *See and compare TFC Bank & Sav. v. Marshall Truss Sys.,* 466 N.W.2d 49 (Minn.1991), overruled on other grounds, 491 N.W.2d 11 (Minn.1992) holding that a owner of a building could reasonably be expected to be affected by the sale of the trusses to the contractor or whoever built a building covered by the UCC warranty provisions.

We conclude that it is neither unfair nor unreasonable to expect sellers to compensate persons or entities who are reasonably expected to be affected by a defective product or defective goods. We hold the harm and damages were foreseeable.

### Tom Steimer's Testimony

A witness was called to the stand—Tom Steimer. He testified that he had a number of conversations in 1988 and 1989 with Mr. Lorenzini. These conversations informed Mr. Lorenzini that the plaintiffs were distributing and selling these 3–D photographs through a multi-level marketing system. The record reflects that every time Steimer talked to Lorenzini that Lorenzini himself would always ask about how the sales were going and how the multi-level distribution marketing system was doing. Lorenzini would ask if the camera sales were up. The record shows that Lorenzini knew that the plaintiffs were going multi-level and Lorenzini had seen Nishika brochures. Lorenzini stated that the brochures looked very good.

But there was a discussion about quality control facilities at the 3M lab in Ferrania, Italy. The technical people at Ferrania gave a complete tour of their analytical labs and test facilities showing that these were some of the best analytical labs that Steimer had ever seen. Steimer testified that his impression of the laboratories was that they were of excellent grade. Steimer was shown some new photographs. These new photographs used the new and improved emulsion. Steimer saw a large display of such photographs hanging in the main foyer of the building at Ferrania, Italy.

### Dick Yost's Testimony

This testimony came from a witness named Dick Yost. Yost was an ex-vice president of the plaintiffs who had been fired. Under the circumstances, we think that his testimony is of cogent probative value. Nevertheless, it was the prerogative and duty of the jury to pass upon his credibility and the weight to be given his testimony.

We conclude that the record contains evidence of probative evaluation and force that demonstrates and proves a breach of implied warranties. The statement of facts contains testimony that one Dr. Podsiadly and Mr. Lorenzini stated that the product of 3M and problems of 3M causing the harm to the Nishika system were definitely a 3M problem and that 3M would solve it. In the record, we find:

Q. What did they say to you about the problems, who was causing the problems?

A. They said that it was definitely a 3M problem and that they would solve it.

Q. And what did they say the problem was?

A. Incompatibility between the print material and the backcoating solution, Generation I. ["They" were 3M officials.]

Lorenzini explained to Yost that the new emulsion system was being used in large displays and large display film that was being manufactured in Italy and was being supplied to customers in Europe. We find in the record:

Q. Did Mr. Lorenzini tell you why 3M had changed the emulsion?

A. To make improvements.

Q. Did he tell you what those improvements were?

A. Yes. He said we could expect improved color saturation, less propensity to scratch, and that it would be about 20 percent faster photographically in speed.

Q. Did he explain to you the changes, the actual changes that 3M had made in order to accomplish those things?

A. No, he did not.

Q. Did—now, Dr. Podsiadly, what do you understand he did with 3M?

A. I understood Dr. Podsiadly to be an emulsion technologist person who had been involved in emulsion programs in the past for 3M.

Q. Did he add anything to what Mr. Lorenzini said that evening about the new emulsion?

A. Not really.

Q. Okay. Did Mr. Lorenzini say anything to you about—well, he did talk to you about how—what effect—how it would effect the 3–D system, correct?

A. He anticipated that it would work in the 3–D system.

Q. Did Dr. Podsiadly in any way contradict that?

A. No, he did not.

Q. Did Dr.—Dr. Podsiadly or Mr. Lorenzini at that meeting tell you that Len-Tec needed to test this new emulsion for compatibility for the backcoat before you used it?

A. No, sir, they did not.

There is additional evidence and testimony of high probative evaluation and force to raise the issues concerning implied warranties.

As an example, inter alia, Dr. Podsiadly anticipated that the new emulsion would work in the 3–D system. Neither Mr. Lorenzini or Dr. Podsiadly suggested that the plaintiffs needed to test the new emulsion for any purpose other than whether it would adhere to the new base material. Also, the record reflects that Roger Lorenzini's demeanors, and words, and actions and statements about the improvements left Yost with the belief that the improvements would work in the 3–D system. Lorenzini stated at the meeting that the improvements should work in "our particular usage in the 3D system". Lorenzini's position and statements lead Yost to believe that 3M had tested the new emulsion.

The non-testing by 3M surprised Yost. Yost stated that because of the words that were used by Lorenzini in describing the new improved product and how the new improved product would work in the Nishika Plaintiffs system, (and also because of Yost's background experience) Yost would conclude that 3M had tested the new product. Again, we find in another part of the record, that Mr. Lorenzini had informed representatives of the Nishika Plaintiffs at a night meeting that the new emulsion and the new products would work well in the 3–D system.

Thus, the record (including Steimer's and Yost's testimonies) reflects that there existed a breach of implied warranty of merchantability since the products were not properly saleable. Nor were these products fit for the ordinary purposes for which they were intended, nor were they fit for the particular purpose involved. MINN.STAT. § 336.2–314(2)(e).

■ Under the appropriate and relevant UCC provisions goods to be merchantable must be at least such as are fit for the ordinary purposes for which such goods are intended. *Nelson v. Wilkins Dodge, Inc.,* 256 N.W.2d 472 (Minn.1977). *Willmar Cookie Co. v. Pippin Pecan Co.,* 357 N.W.2d 111 (Minn.App.1984). This same evidence sustains the jury's finding of a breach of an implied warranty of fitness for a particular purpose inasmuch as 3M knew and had knowledge and noticed that the Nishika Plaintiffs wanted and intended the emulsion and backcoat sauce to be used together for the development for 3–D photographs. Therefore, 3M had notice and knowledge both of the particular purpose for which the goods were required and also that the Nishika Plaintiffs were relying on 3M's skill to furnish suitable, compatible goods as 3M had, in the past, done for both the Nishika Plaintiffs and also previously for Nimslo. Thus, that is all that the law requires to demonstrate serious breaches of implied warranty. MINN.STAT. § 336.2–315 (1966). We think that the record shows that 3M's emulsion and backcoat sauce were incompatible, one with the other, and this incompatibility resulted in worthless, faded photographs. The jury upon ample evidence found against 3M.

The jury weighed and evaluated the evidence and testimony and found that the awarded damages were foreseeable. The court's instructions to question number thirteen—the money damage issue—clearly state that a party seeking damages must prove the nature, extent, duration, and consequences of his harm. Also this determination of damages must not be based on speculation or guess. The term "damages" means a sum of money that will fairly compensate a person injured. Damages may include past and future injury. However, it must be proved that such future injury is reasonably certain to occur.

Importantly, on the issue of foreseeability is that at previous times in the development of 3-D print material by 3M, Nimslo had experienced some serious problems with respect to the fading of 3-D prints because of 3M's emulsion materials. But the problem was solved by 3M's production of improved emulsion materials brought about in consultation was Nimslo's engineers. Having awareness of Nimslo's problems, the Nishika Plaintiffs had specifically advised 3M that it was essential to their own businesses, (that is, Nishika Plaintiffs' businesses) that the photographic emulsion materials supplied by 3M be suitable for the ordinary purpose for which they were intended, that is, suitable for proper processing for 3-D photographs.

3M had reason to know and knew of both the particular requirements and needs of the Nishika Plaintiffs and that lost profits would likely and foreseeably result from a breach of warranty. MINN.STAT. § 336.2–715(2)(a). This section provides that consequential damages include *any loss* resulting from general or particular requirements and needs of the buyer which the seller at the time of contracting *had reason to know or actually knew.*

Evidence and testimony both possessing probative force and evaluation demonstrate that the two products of 3M which were manufactured and intended to be used with one another were incompatible with one another. Simply put, the record is replete that 3M's emulsion and backcoat sauce were incompatible, one with the other, which necessarily resulted in worthless, faded photo-graphs. These faded, valueless photos ruined the plaintiffs' business.

### The Harm Issue

■ The construction and use of the term "harm" is properly consistent with Minnesota law inasmuch as Minnesota courts do not require physical injuries or harm or property damages. Under MINN.STAT. § 336.2–313(1)(a) (1966), it is provided that "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise."

We conclude that 3M expressly represented that the emulsion material was "new" and "improved" and that this "new" emulsion would work well with the Nishika Plaintiffs' system and that the "new" emulsion material was suitable for making 3-D pictures. But the new emulsion resulted in harm.

These representations clearly create express warranties in the Nishika Plaintiffs' favor. MINN.STAT. § 336.2–313(1)(a). The testimony about the new emulsion (from 3M) described it as both "new" and "improved" and would work well together in the plaintiffs' system.

### The Disclaimer Issue

■ Additionally, 3M has contended and argued that certain disclaimers of the warranties absolve 3M from liability. We disagree. When, as here, *certain express warranties are incompatible and hostile with the attempted warranty disclaimers,* then the express warranties govern and control. The express warranties control and the buyer is entitled to relief and remedies. *See Hydra–Mac, Inc. v. Onan Corp.,* 450 N.W.2d 913, 917 (Minn.1990).

■ Here, the jury, upon ample evidence found that 3M breached its express warranty. Therefore, 3M's attempted disclaimers are not efficacious. The express warranties are paramount. The attempted disclaimers do not eviscerate the implied warranties; that is to say that the attempted disclaimers fail to make ineffective the implied warranties. Also, as to the attempted

disclaimers, section 2–316(2) requires that such disclaimers be conspicuous. MINN.STAT. § 336.2–316(2). 3M's attempted or claimed disclaimers were in small, even minuscule, type on a form invoice. The printing was not capitalized; nor was the printing of a contrasting type or face or different color. We determine that the attempted disclaimers were not conspicuous and therefore, not effective. 3M failed to use the word "merchantability" in the germane attempted disclaimer. Since 3M's disclaimer did not allude to merchantability and did not use that word, the disclaimer is ineffective as to the warranty of merchantability. MINN.STAT. §§ 336.2–316 and 336.2–316(2); *See also Soo Line R. Co. v. Fruehauf Corp.*, 547 F.2d 1365, 1373 n. 13 (8th Cir.1977).

 Furthermore, the invoices did not create an exclusive or even an adequate disclaimer for 3M under MINN.STAT. § 336.2–719(2). *See and compare Jacobs v. Rosemount Dodge–Winnebago South*, 310 N.W.2d 71, 76 (Minn.1981). Thus, it has been correctly held that where the remedy fails in its essential purpose, it becomes ineffective and consequential damages may be recovered. The attempted limitation of remedies and the attempted exclusion of consequential damages was not effective because the same were not conspicuous. MINN.STAT. § 336.1–201(10). Finding no agreement as to liquidated damages, UCC 2–718 is not implicated. Likewise, as noted herein, since there was a failure of essential purpose, UCC 2–719 is not an effectual, productive or operative defense.

Under this lengthy record, 3M permitted the Nishika Plaintiffs to introduce evidence on consequential damages and losses without objecting that the evidence was inadmissible for any valid reason or that the evidence went beyond the plaintiffs' pleadings.

 Under the state of this record, we conclude the Nishika Plaintiffs were not required to plead defenses as to the invoice matters. *See Dresser Industries, Inc. v. Page Petroleum, Inc.*, 853 S.W.2d 505, 509–10 (Tex.1993). We think that the rule is clearly established that the failure to object to evidence on the ground that it was not pleaded waived any requirement of such

pleadings. 3M failed to preserve this alleged error. Also whether a term or clause is conspicuous or not is for decision by the court. The court ruled correctly.

### The Evidentiary Rulings: The Complaint Letter

 Nextly, 3M complains of several evidentiary rulings made by the trial judge. This contention is brought forward in 3M's point of error number four. 3M was in the position and had to bear the burden of showing that there was no ground upon which the trial court could have properly excluded the hearsay evidence. Therefore, even if the trial court arguably erred in sustaining an objection—and we do not agree that the trial court erred—nevertheless, our appellate court will uphold that ruling if there was another proper ground for the trial judge's ruling. *See State Bar of Texas v. Evans*, 774 S.W.2d 656, 658 n. 5 (Tex.1989).

3M has not demonstrated that the contended-for error amounted to such a denial of the rights of that defendant as was reasonably calculated to cause and probably did cause the rendition of an improper judgment in the case. TEX.R.APP.P. 81(b)(1). *See Gee v. Liberty Mut. Fire Ins. Co.*, 765 S.W.2d 394 (Tex.1989). The rule is now well established for 3M to properly discharge its burdens under TEX.R.APP.P. 81(b)(1), that 3M had the burden to show and to demonstrate that the whole case depended upon the evidence that was excluded. *See Guentzel v. Toyota Motor Corp.*, 768 S.W.2d 890, 899–900 (Tex.App.—San Antonio 1989, writ denied); *Shenandoah Assoc. v. J & K Properties*, 741 S.W.2d 470, 490 (Tex.App.—Dallas 1987, writ denied).

 As an example, one of 3M's exhibits, the so-called 91 percent complaint letter, (offered for the truth thereof) stated that 91 percent of the complaints received during the relevant period (which relevant period was prior to the use of 3M's defective emulsion) resulted from film processing delays. Inasmuch as this 91 percent complaint letter was written before the defective photographs were distributed to Nishika's customers, the same simply was not probative and it simply failed to prove anything about the effect of

3M's later breaches of warranties to the Nishika Plaintiffs and to their customers. No error is shown.

### Other Evidentiary Rulings

In 1989, there had been some delays in film processing and some resulting complaints. But, very significantly, 3–D camera sales remained strong and the sales were steady through the end of December, 1989. It must be borne in mind that the Nishika Plaintiffs requested that the jury compensate them *only for the harm caused by 3M's defective products* as evidenced by one example, inter alia, the 600 percent decline in sales in the one month period that immediately followed the time that the defective 3–D photographs had been distributed.

It is immaterial as to the percentage of the complaints that were lodged simply because these complaints took place before the defective 3M products began to be used. Therefore, 3M's exhibit 221 was correctly excluded under TEX.R.CIV.EVID. 401 and 403. Exhibit 221 is not referable to 3M's defective products.

■ We determine that the exclusion of the basis or the grounds of the expert's opinion was harmless. This is especially true because it must be borne in mind that the expert's opinion and testimony about consumer complaints were in fact introduced into evidence. 3M's expert was permitted to testify that the number of complaints concerning the 3M problem—being, inter alia, the fading pictures—was insignificant in relation to the total number of complaints. The excluded information was cumulative. *Birchfield v. Texarkana Memorial Hosp.*, 747 S.W.2d 361 (Tex.1987).

■ But 3M fails to acknowledge that the bases of an expert's opinion (even if same are admissible) are *admissible only for the limited purposes of identifying the bases of that opinion. See and compare First Southwest Lloyds Ins. Co. v. MacDowell*, 769 S.W.2d 954, 958 (Tex.App.—Texarkana 1989, writ denied). Thus, by not limiting properly its offer of this phase of the expert's testimony, 3M has waived its complaint. TEX.R.CIV. EVID. 105(a)(b).

■ Furthermore, we conclude that the excluded evidence was prejudicial to an unfair extent and that the excluded evidence was inadmissible hearsay evidence. The Rules of Civil Evidence clearly provide that hearsay evidence, whether in written form or oral form, must ordinarily be excluded. In briefest terms, hearsay is a statement made outside a court that is offered in court to prove the truth of the matter asserted. The hearsay doctrine or rule also includes any matter implied by an out-of-court statement. TEX.R.CIV.EVID. 801(a)(1), (c), (d), 802. We conclude that 3M's complaint is about evidence that was in the traditional and classical sense hearsay evidence. 3M did not call a single relevant declarant to the stand. There was no chance for cross-examination. Cross-examination has been declared the greatest tool to arrive at the truth. 3M could have deposed the relevant declarants and the opposite party would have had the valuable right of cross-examination to arrive at the careful, whole truth of the matter. *See White Industries v. Cessna Aircraft Co.*, 611 F.Supp. 1049 (D.C.Mo.1985).

■ 3M contends that the germane letters became admissible under the "state of mind" exception under TEX.R.CIV.EVID. 803(3). But Rule 803(3) simply does not apply to a statement of memory or a belief to prove the fact remembered or believed. Thus, the "state of mind" exception is not applicable. The challenged, excluded letters were not admissible under the "business record" exception. 3M failed in its duty to show proper, necessary, and complete business record predicate for admitting the complaint letters. The opposite party timely and properly made correct hearsay objections. No error is shown.

There is ample precedent holding that such complaint letters simply lack the necessary trustworthiness to qualify as business records. Such letters are not trustworthy because the customer's complaints may be very accusatory and self-serving. Query: But how could someone at 3M have known that the letters were correct and trustworthy? These are not business records of either party. None of these writers or declar-

ants were under oath. But much more importantly the opposing party had absolutely no opportunity to cross-examine these letter writers. Cross-examination is crucial and paramount because only through cross-examination can the credibility of the declarant or letter writer be tested as to accuracy, bias, motive, prejudice, self-interest, ability to recall, and ability to remember. The trial judge committed no error in his rulings on inadmissibility.

The customer letter writers could certainly have been placed on the witness list and brought to the stand so that the jury could view them. The challenged letters were obtained during discovery. The record reveals that 3M's expert had interviewed a number of the distributors. Nevertheless, 3M chose not to call even one of the distributors to the stand in an attempt to buttress their theories or attempt to rebut the testimony of the distributors that the Nishika Plaintiffs had called to the stand.

■ The sounder rule is that an expert witness should not and must not be permitted to recount hearsay conversations and hearsay statements from a third person even if that conversation or statement formed some part of the basis of his opinion. *Birchfield v. Texarkana Memorial Hosp., supra.*

### The Trial Court's Later Communication with the Jury

■ The trial court issued a supplementary jury instruction to the effect that the jury should engage in further deliberation in an attempt to reach a verdict. In this regard, the trial court has considerable discretion. Our Supreme Court noted in an important case, styled *Stevens v. Travelers Ins. Co.,* 563 S.W.2d 223, 228 (Tex.1978) that: "[o]ur law does not contemplate that every jury will function perfectly and, to that end, broad discretion is vested in the trial judge in aid in administering and expediting the fact finding process." To test and analyze a certain charge on the complaint that the same is coercive, the charge must be analyzed in its entirety. *Id.* Even some partial coercive statements contained in a supplemental jury admonishment will not invalidate the jury's verdict unless the supplemental

charge retains its coercive nature when read as a whole and in the totality of all the surrounding circumstances. *Id.* We observe that the submitted language was less coercive than the language used in the *Stevens* charge. The trial court in this case instructed the jury as follows:

> Under no circumstances are you to consider these additional instructions as being coercive on the part of the Court, or any indication on the part of the Court that any individual juror should yield his own conscience and positive conviction on the fact issues submitted to you....

> [I]t is your duty as a juror to keep your mind open to every reasonable argument that may be presented by fellow jurors based upon the evidence presented in this case. A juror should not have any pride of opinion and should avoid hastily forming or expressing an opinion. In the course of your deliberations, do not hesitate to reexamine your own views and change your opinion if convinced it is erroneous. *Do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict.* (Emphasis added.)

■ This supplemental instruction was not coercive. The supplemental instruction requested the jury to consider reasonable and honest deliberations in an attempt to resolve the contested litigation; the same was not coercive and, therefore, not erroneous. *See and compare Firestone Tire & Rubber Co. v. Battle,* 745 S.W.2d 909, 916–17 (Tex.App.—Houston [1st Dist.] 1988, writ denied).

■ The trial court advised the fact finders: "If you cannot reach a verdict, the Court will release you within a reasonable length of time." Of course, the length of time that a jury is required to deliberate certainly rests within the broad discretion and sound judgment of the trial judge and before that discretion can be held to have been abused and before that discretion will be disturbed or overturned on appeal, there must be a showing backed up and sustained by substantial evidence that it was all togeth-

er improbable that the jury would have reached a verdict. *Shaw v. Greater Houston Transp. Co.,* 791 S.W.2d 204 (Tex.App.—Corpus Christi 1990, no writ). The record of the hearing on this matter explodes 3M's contentions.

In this appeal before us, probative evidence does not exist—nor does substantial evidence exist—that it was altogether improbable that the trial jury would or could not reach a verdict. Even so, it has long been the rule in our State that a juror is prohibited from testifying as to his mental processes or the effect of anything upon his mind or emotions. A juror usually is not allowed to impeach or destroy his own verdict. Tex.R.Civ.P. 327(b). But the judge is the sole trier of facts. He can disbelieve the witness; that resolves the issue.

### 3M's Contention on Pre-judgment Interest

In its ninth point of error, 3M argues that the trial court erred and abused its discretion in its award of pre-judgment and post-judgment interest. In particular, 3M argues that the trial court erred in awarding pre-judgment interest under Tex.Rev.Civ.Stat.Ann. art. 5069–1.05 § 6 (Vernon Supp.1994). Additionally, 3M argues that the trial court erred in awarding the post-judgment.

■ The totality of Minnesota law must be applied and this includes Minnesota law governing pre-judgment and post-judgment interest. Judgment interest rates are a matter of substantive law, *Bergstrom A.F.B. Fed. Credit v. Mellon Mortg.,* 674 S.W.2d 845, 851 (Tex.App.—Tyler 1984, writ ref'd n.r.e.); therefore, the law of the State of Minnesota controls. This is true for both types of interest. *See Bott v. American Hydrocarbon Corp.,* 458 F.2d 229, 231–232 (5th Cir.1972); *Corrosion Rectifying Co. v. Freeport Sulphur Co.,* 197 F.Supp. 291, 293 (S.D.Tex.1961); Restatement (Second) of Conflict of Laws § 207 cmt. e (1971).

■ Minnesota law bars pre-judgment interest on future damages. Minn.Stat. § 549.09(1)(b) (1992); *Stinson v. Clark Equip. Co.,* 473 N.W.2d 333, 336 (Minn.Ct.

App.1991, review denied). Since the damages were not segregated, there can be no prejudgment interest awarded.[1]

Minnesota law, Minn.Stat. § 549.09(2) provides that interest shall accrue on the unpaid balance of the judgment as prescribed each year by the state court administrator pursuant to Minn.Stat. § 549.09(1)(c). For 1993, the state court administrator determined the interest rate to be to 4% per annum simple interest.

As to 3M's point of error number nine, we reform the judgment of the court below by deleting the award of pre-judgment interest and establishing post-judgment interest at 4 percent and as reformed, 3M's point of error nine is sustained.

### *The Invoices—Revisited*

■ The printing on the invoice was too crowded and at the very bottom of the page and the print was too small. These invoice defenses were not based on proper pleadings. Also, we conclude that the Minnesota law by deleting the last fifteen words from Alternative C makes such invoice clauses (being inconspicuous and attempting to allocate the burden of determining suitability and the risk) to be contrary to Minnesota law. We think that UCC 2–318 was decimated when Minnesota adopted its formulation of Alternative C of section 2–318 with Minnesota's deletions.

We think UCC 2–719(3) was curtailed by section 2–318. This section 2–719(3) defense to damages was not pleaded. As to a number of these complaints, based on the invoices, it is obvious that the printing is so small as compared to the other printing on the invoices as to be very inconspicuous and therefore not binding.

■ We fail to see that the very small printing at the bottom of the invoice requires any division of pre-judgment interest. This wording is, in crucial part, illogical, nonsensical, and self-destructive because these invoices read that the seller's only obligation

1. There is an unpublished Minnesota Court of Appeals case in this regard. However, in accordance with Minn.R.App.P. 480A.08 and accepted appellate principals, the case is not precedential.

shall be to replace *such quantity* of the product proved to be defective.

3M is simply obligating itself to send to the buyer a similar quantity of the same defective product. In other words, if the emulsion and the backcoat are defective, then, according to 3M's invoices, the only obligation that 3M has is to send them some more defective emulsion and defective backcoat.

3M tries to limit its liability when the Minnesota legislature has denied that this can be done. In other words, through this inconspicuous, illogical, inconsistent writing on the invoice, the seller tries to take the position it should not be liable for any injury or any loss (direct or consequential) arising out of the use or the inability to use the product. That wording goes against the whole theory of the UCC and it goes against the Minnesota legislature's intention. Simply put, the invoice writing simply tries to repeal the Minnesota law.

3M contends for a "repair and replacement" defense. There was no objection to the damage issue on this basis. There was no pleading making replacement the plaintiffs' exclusive remedy and excluding all other damages, harms, losses, or remedies.

■■■ Next, the seller claims it will not be liable for any injury, for any loss, or for any damage, or for any *direct damages* arising out of the use of the product. This attempts to eviscerate the UCC and the Minnesota law. No appropriate instruction was requested. Instructions must be written and separate from objections. 3M waived this "direct damages" defense.

■■■ But, a provision in the invoice concerns using and users. This shows that 3M did anticipate and attempted to restrict (although ineffectively) its responsibility to persons who were not in *direct* privity with 3M. 3M does not employ the word buyer but says *any user*. In any case, a negation or limitation of an express warranty shall be inoperative to the extent that its construction is unreasonable. Under this record we so find.

These negations and limitations are also unreasonable and ineffective in attempting to exclude or modify the implied warranty of merchantability. The language involved in such attempted exclusion or modification must mention merchantability and must be conspicuous. To exclude or modify the implied warranty of fitness, the exclusion must be in writing and conspicuous. The language on the invoices makes no mention whatsoever of the warranty of merchantability or merchantability itself. This omission of necessary wording is crucial. 3M is unhorsed.

It is interesting to note that the court did admit certain redacted invoices and permitted in evidence the term and condition, "Before using, the user shall determine the suitability of the product for his or her intended use ... the foregoing may not be changed except by an agreement signed by the officer of the seller." The jury did not agree with 3M's position.

### Dr. Podsiadly's Testimony

Dr. Podsiadly was an emulsion technologist person who was involved in the emulsion program in the past for 3M. Mr. Lorenzini further stated during the talk that the improved emulsion *would work in the 3–D system*. Dr. Podsiadly did not contradict that statement in any manner. Neither Mr. Lorenzini nor Dr. Podsiadly told Yost that Len-Tec needed to test this new emulsion for compatibility with the backcoat before using it. The record reflects, of course, that 3M's product and its improved emulsion (working together compatibly) were absolutely crucial to the business of the plaintiffs. *The improved emulsion and the backcoat had to be suitable to each other. They were not.* 3M had actually originally supplied photographic emulsions to Nimslo. 3M knew that compatibility was necessary and essential.

The backcoat sauce and the emulsion supplied by 3M were always intended by 3M to work together. 3M always understood that it was essential that these print materials be suitable for the proper processing of three-dimensional photographs. There was, of course, conflicts in the evidence. The jury resolved them. Ample evidence exists to sustain the jury's finding on express warranties.

### Vice–President Powell's Testimony

Mr. Powell, who was vice-president of the color systems and the photographic products at 3M, attended an important meeting. Powell worked with a Mr. Hotchkiss. Hotchkiss was the overall manager of 3M's quality control and its quality assurance program.

Powell talked about the quality of the product that had been developed and the one that had been developed for Nimslo and the competency and compatibility of 3M's products and 3M's ability to produce them. Powell was very pleased and expressed pleasure about the quality of 3M's products and programs.

In terms of quality control, both he and Mr. Hotchkiss were present to demonstrate their quality control and to give their assurance to their customers. Hotchkiss reaffirmed the quality and the quality control of the emulsion coating and also the backcoat sauce. Hotchkiss had a great deal of pride in those products and Hotchkiss was talking about how they had done the testing for Nimslo and that a great deal of effort was put into it and that they had arrived at good products and that the products worked very well together and 3M was satisfied. The record reflects that both Mr. Powell and Mr. Hotchkiss were proud of their products and talked of them as a system and that the products worked well together.

Thus, we must conclude that the record reflects affirmation of facts and promises made by the seller to the buyer. We find that the evidence is amply sufficient and is of probative force and evaluation to sustain and support the jury's answer to question number one dealing with express warranty and its violation and breach. And this evidence implicates implied warranties as a separate ground of liability against 3M.

### Texas Statutory Policy

The litigation took place in a Texas district court and the judgment entered was obviously a Texas judgment and the pertinent Texas civil statute affirmatively states in substance that all judgments in the courts of this State shall bear pre-judgment and post-judgment interest. There is a valid reason and a public policy undergirding such statute. It is to thwart certain recalcitrant litigants for delaying a trial time and time again and cluttering and overloading the trial dockets of Texas.

There are other valid reasons including, inter alia, litigants who, with poor defenses, wrongfully seek to keep their funds at interest. Under the prior law, the injured parties suffered unjustly. We construe the governing statute to be mandatory. If the legislature had a different intention and if the legislature had meant that the only judgments (that would bear interest) would be those where the Texas substantive law governed the rights and the responsibilities of the parties; then, we think, in its wisdom the legislature would have so mandated. The language of the statute contains no ambiguities. Texas can control and govern its own State courts.

### Dietmar Schellenberg's Testimony

From the testimony of Dietmar Schellenberg we note that Lorenzini and Powell, stated that the new emulsion had a slightly higher speed and also a slightly improved contrast. From 3M's Dr. Kistner we note that there is evidence that the concentration of the lactic acid in the backcoat was changed. As a result, rather than the photographs fading in a matter of days, the fading was occurring in about a three to four week period. Many difficulties resulted from this fading, harmful to the plaintiffs. Even so, 3M and its representatives sold the products that it characterized in an express manner as "new" and "improved".

It was a "new" and "improved" emulsion. Yet 3M did not inform either Nishika or LenTec that the emulsion had not been tested for compatibility with 3M's own backcoat sauce or that the product itself was indeed experimental. The record reflects that either Mr. Lorenzini or Dr. Podsiadly stated that they thought it was a compatibility problem between the backcoating and the new emulsion.

The record contains:

Q. And, again, Mr. Paulis, are you sure that it was—that either Dr.—Mr. Lor-

enzini or Dr. Podsiadly said they thought it was a compatibility problem between the 3M backcoat and the 3M HT Emulsion?

A. Oh, yes, I'm very sure.

Q. How do you remember that?

A. That was the first time that—that I could see, I guess you could say, the light at the end of the tunnel, or that they were saying, "Yes. There's a big problem. It's our responsibility. We think there's a compatibility problem. We'll do all we can to help you out."

Q. At the end of this meeting, did any of those three gentlemen suggest a course of action for correcting the problem?

A. Just that we continue working with Dr. Kistner on Generation II.

Q. Now, you said Dr. Podsiadly was going to—was going to talk to the people in Italy. Did you ever hear back from Dr. Podsiadly about what 3M Italy's thoughts of the problems were?

A. No, I didn't.

Q. Did you ever hear back from Mr. Lorenzini about what 3M was going to do to solve these problems?

A. No, I never did.

### 3M's Points of Error and Nishika's Reply Points

3M brings forward an excellent brief urging nine points of error. The points of error in brief summary are:

1. Because applicable law precludes recovery for breach of warranty by American 3D and Nishika Hong Kong, the trial erred in submitting, over 3M's objection, a damage question (Question No. 13) that combined Nishika Ltd., LenTec, American 3D and Nishika Hong Kong.

2. As a matter of law, American 3D and Nishika Hong Kong may not recover under any breach of warranty theory; therefore, there is no evidence to support any of the jury's breach of warranty findings as to those plaintiffs, and the trial court erred in failing to render judgment for 3M and in overruling 3M's other post-verdict motions.

3. The trial court erred in ruling, over 3M's objection, that Minnesota law applies to this case.

4. The trial court erred in excluding critical evidence that rebutted plaintiffs' theory of causation.

5. There is no legally or factually sufficient evidence to support the jury's damage finding with respect to Nishika Ltd., LenTec, American 3D and Nishika Hong Kong (Question No. 13), including, without limitation, the jury's finding that the alleged consequential damages were foreseeable by 3M; therefore, the trial court erred in overruling 3M's post-verdict motions.

6. There is no legally or factually sufficient evidence to support the jury's finding of express warranty (Question No. 1); therefore, the trial court erred in overruling 3M's post-verdict motions.

7. The trial court erred in excluding evidence of the terms and conditions of sale in 3M's invoices to LenTec, which validly disclaimed all implied warranties, provided replacement as an exclusive remedy for defects in the product, excluded consequential damages, and allocated the risk of unsuitability to LenTec and Nishika.

8. The trial court erred and abused its discretion by submitting, over 3M's objections, a coercive and improper supplemental, verdict-urging instruction to the jury, and by refusing to submit 3M's Requested Instruction AA in lieu of the instruction given.

9. The trial court erred and abused its discretion in its award of prejudgment and post-judgment interest.

By appropriate reply points, the Nishika Plaintiffs challenged each of these points of error. In this opinion we attempt to address 3M's nine points of error. In doing so, we have attempted to write the opinion for the attorneys involved and their briefs submitted rather than to the public at large.

### Certain Questions Concerning the Warranties, Express and Implied and their Breach Revisited

In this opinion, we have concluded and we have held that the jury has found as a complete ground of recovery three different and distinct breaches of warranty. They are: (1) breach of the implied warranty of merchantability; (2) breach of the implied warranty of fitness for a particular purpose; and (3) breach of an express warranty. Since these are separate and independent grounds of recovery on the issues of liability, only one ground must prevail. If one ground prevails, and we think all three have prevailed, then the judgment is properly affirmed.

The record amply sustains the findings made by the jury that 3M breached express warranties made to the Nishika Plaintiffs. Therefore, the recovery of damages by the plaintiffs is justified on the ground that express warranties were violated.

### No Reversible Error is Preserved in Relationship to 3M's Challenges to the Jury's Complete Findings that 3M had Breached the Implied Warranties

■ As noted elsewhere in this opinion, we determine that the new emulsion and the backcoat sauce—being two products manufactured by 3M—were to be used together. The record shows that they were incompatible with one another and unsuitable to be used together. Therefore, in this context, inter alia, sufficient probative evidence exists showing a breach of the implied warranty of merchantability. These two products were neither saleable nor were they fit for the ordinary purposes for which they were intended. MINN.STAT. § 336.2–314(2)(c). Under Minnesota law goods or products to be merchantable must be such as are fit for the ordinary purposes for which such products are used; this covenant includes sales for resales. *See Nelson v. Wilkins Dodge, Inc.,* 256 N.W.2d 472 (Minn.1977).

This same body of proof sustains the jury's series of findings proving a breach of the implied warranty of fitness for a particular purpose, because 3M knew that the Nishika Plaintiffs desired the new and improved emulsion and the backcoat sauce for the development of the 3–D photographs and for use in the plaintiffs' 3–D photographic system. Indeed, the Nishika Plaintiffs were relying upon the skill of 3M to manufacture, produce, and furnish suitable materials just as 3M had done at previous times for both the Nishika Plaintiffs here and also for Nimslo. The Minnesota law requires no more. MINN. STAT. § 336.2–315. This compatibility resulted in faded, worthless photographs and pictures.

### The Legal Effect of the Printing on 3M's Invoices and 3M's Burdens

■ 3M asserts that the small invoice language disclaimed both implied warranties and limited the plaintiffs' recovery and remedies and allocated the burden of the testing of 3M's products to Nishika. But 3M was obliged to demonstrate that the invoices in some manner became a part of the contract between the parties. In this responsibility and obligation, 3M met with failure.

■ Also, 3M waived the issue of course of dealing concerning any limitation of the Nishika Plaintiffs' remedies. On this point, 3M maintains that the trial court should have permitted the introduction of the excluded invoice language on two invoices—further maintaining that these two invoices proved a "course of dealing". They did not. The two relied upon invoices were sent one and two years earlier.

■ We note that 3M urged its "course of dealing" defense in conjunction with Nishika Plaintiffs' claims for breaches of implied warranties. 3M failed to request a jury question or an instruction relevant to any limitation of the Nishika Plaintiffs' remedies, as such, based on "course of dealing". Since 3M failed to request a question or an instruction relating to the parties' ability to limit the plaintiffs' remedies—including their right to recover consequential damages—then based on this theory of defense, 3M has waived its right to complain on this defensive issue. TEX.R.CIV.P. 279; *Akin v. Dahl,* 661 S.W.2d 911, 913 (Tex.1983), *cert. denied,* 466 U.S. 938, 104 S.Ct. 1911, 80 L.Ed.2d 460

(1983). When a party fails to request the submission of an independent ground of defense, which is not conclusively established under the evidence, that party has waived that defense.

Notably, the court by instructions charged the jury properly on "cause of dealing", "cause of performance", and "usage of trade". 3M's objections are not sustainable.

Of importance, in this regard, is the jury's finding that 3M breached an express warranty. 3M's failure to request an instruction relative to the attempted limitation of the Nishika Plaintiffs' remedies based on "course of dealing"—given this procedural posture—relieves our Ninth Court of Appeals from the necessity of deciding 3M's arguments and contentions in its point of error number seven. The breach of the express warranty, in this aspect, supports the trial court's judgment.

### The Record is Devoid of "Course of Dealing" Evidence

A "course of dealing" is defined in substance as being a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct. MINN.STAT. § 336.1–205(1).

The record shows that the defective emulsion was first shipped in December, 1989. The invoice for that emulsion was dated February 19, 1990—being about two months after the material was shipped and the transaction completed. Prior to this time and event, 3M had delivered only two prior shipments. The invoice for the very first shipment was dated April 7, 1988. This April date occurred almost two years before the invoices in our present litigation. Likewise, the invoice for the second shipment was dated January 31, 1989, being over one year before the challenged invoice in this litigation.

Both of these older invoices were sent after the products had been shipped and the transaction completed. These invoices were delivered only to the accounting department of Nishika. Therefore, these invoices do not establish a common basis of understanding

for interpreting the conduct of the parties. These attempted fine print disclaimers did not constitute an integral part of the transaction. Indeed, the transaction had long since been concluded and completed. These invoices did not constitute the dignity of an express agreement; there was no express agreement by the parties as to the invoices.

■ Under Minnesota law any warranty disclaimer must be treated as constituting an affirmative defense. The burden is upon the party asserting the disclaimer to establish that the disclaimer was delivered at the time of the sale and constituted an integral part of the transaction. The disclaimer cannot come about at a later time. The effectiveness of such a disclaimer depends on whether under the surrounding circumstances the alleged disclaimer, as such, approaches the dignity of an expressed agreement as comprehended by Minnesota law. See Noel Trans. & Pkg. Del. Serv., Inc. v. General Motors Corp., 341 F.Supp. 968, 970 (D.Minn.1972). These attempted disclaimers failed under Minnesota law.

There is a lack of evidence in this record to show that 3M ever alerted the Nishika Plaintiffs to the possibility that the terms of the invoices were intended to control. There is no evidence that the same were discussed. There is no evidence that any employee of the Nishika Plaintiffs ever saw or read the fine print of the invoices or that any of the Nishika Plaintiffs agreed to heed or be bound by the invoice terms.

■ There is likewise no evidence of "previous conduct between the parties" with reference to the inconspicuous, hidden invoice terms. There was no "common basis of understanding". "Course of dealing" by its very nature and by its very terms does not include opportunistic and unconscionable conduct by one party in attempting to, at a later time, slip material governing terms into a concluded agreement and completed transaction. Appellant's point of error number seven is disallowed.

### Repair and Replacement Defense

■ Under Minnesota law when the remedy fails of its essential purpose, it be-

comes ineffective and consequential damages may be recovered. In this regard, 3M relies on cases that have concluded—on their particular facts—that a limited remedy had actually served its own essential purpose. We concede that the "repair and replace" limitations make good sense and should be effective in some cases. These cases would include various types of machinery and automobiles with easily replaceable parts. Indeed, these replaceable parts are actually interchangeable parts.

■ But, that is not our case here concerning the Nishika Plaintiffs' defective photographic prints. 3M could not replace or repair the faded, defective photographs. Indeed, only the Nishika Plaintiffs—certainly not 3M—had the facilities to try to correct the defective photographs. The plaintiffs tried but could not make repairs because of 3M's breaches of various warranties. The replacing of any print material, after Nishika Plaintiffs' credibility had been shattered and broken and their business ruined and destroyed, could serve no essential or meaningful purpose. The record here shows a classic example of a remedy's failing in its essential purpose.

For this compelling and cogent reason the Nishika Plaintiffs are entitled to the remedies provided under Minnesota's version or formulation of the Uniform Commercial Code which definitely included the recovery of consequential damages and lost profits. We have examined the other contentions of 3M regarding their asserted and attempted disclaimers and limitations involving the implied warranties. We conclude that the same are without merit.

No assigned, briefed, or argued point of error is presented attacking the multi-level direct-sale-camera-distribution system.

Each of 3M's points of error complaining of "no evidence" or "insufficient evidence" are hereby, after due consideration, overruled. In doing so, we have assiduously labored to apply the long accepted standards of appellate review. *Garza v. Alviar*, 395 S.W.2d 821 (Tex.1965); *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (1951). Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 TEX.L.REV.

361 (1960), St. John Garwood, *The Question of Insufficient Evidence on Appeal*, 30 TEX. L.REV. 803 (1952). *See also* William Powers, Jr. and Jack Ratliff, *Another Look at "No Evidence" and "Insufficient Evidence"*, 69 TEX.L.REV. 515 (1991).

The length of the opinion is a concern to us. But considering the length of the record, being 23 volumes of transcript consisting of over 4,000 pages, and 49 volumes of statement of facts consisting of approximately 6,000 pages, as well as the matters brought forward in the excellent briefs, we do not apologize for the length of this writing. Nothing written herein is meant, even to the slightest degree, as any criticism of any of the attorneys, trial or appellate, or of any of the parties. All of the lawyers performed capably and professionally.

### *Miscellany*

We have quoted in brief, bare-bones form some of the evidence of a few of the witnesses in question and answer form. The record, in addition thereto, clearly and forcefully contains additional evidence of probative force and value that supports our decision on the entirety of the case and also on the points of error brought forward by 3M based on "legal insufficiency" and "factual insufficiency". We followed the diktats of our State Constitution. *See* TEX. CONST. art. V § 6; art. I § 15; *Cropper v. Caterpillar Tractor Co.*, 754 S.W.2d 646 (Tex.1988).

In conformity with the above opinion, we necessarily overrule each and all of 3M's points of error with the exception of point of error number nine, as reformed above. For the reasons above stated we reform the judgment as pertains to the award of the prejudgment interest and establish post-judgment interest at 4 percent, and as reformed, we affirm the judgment of the trial court.

REFORMED, AND AS REFORMED, AFFIRMED.